NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 8, 2017
Decided August 22, 2017

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

No. 17-1800

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee*, | Court for the Southern District of |
| | Illinois. |
| *v.* | |
| | No. 16-CR-30125-MJR |
| OLIVER W. HAMILTON, | |
| *Defendant-Appellant*. | Michael J. Reagan, |
| | *Chief Judge*. |

**O R D E R**

Oliver Hamilton pleaded guilty to violating 18 U.S.C. § 1343, the wire fraud statute, after charging more than $40,000 in personal expenses to a credit card belonging to the East St. Louis Township. Hamilton was entitled to use the card for official purposes only, in his capacity as Township Supervisor. Intending to send a strong message about the seriousness of Hamilton's offense, the district court sentenced him to 60 months' imprisonment, a period more than triple the high end of the original guidelines range; the judge also imposed a three-year term of supervised release. On appeal, Hamilton complains that his prison sentence is unreasonably long. Judges are

entitled, however, to choose a sentence above the advisory guidelines range, see, *e.g.,* *Gall v. United States*, 552 U.S. 38 (2007), and they are entitled to take both general and specific deterrence into account, see 18 U.S.C. § 3553(a)(2)(A), (B). Chief Judge Reagan explained his choice of sentence adequately, and we see no reason to disturb it.

**I**

Hamilton, who is now 63 years old, became the East St. Louis Township Supervisor in early 2011. The township has an elected Supervisor, along with other officials. The Supervisor serves as its Chief Executive Officer, the Chair of its Board of Trustees, and its treasurer. It appears to be a special-purpose entity, which is responsible for running various social programs for the area residents; it also operates a food pantry and a senior-citizens' center.

In the summer of 2016, authorities learned from several sources that Hamilton was misusing township funds. The ensuing investigation turned up undocumented, suspicious, and misclassified expenditures in the township's records. The investigators ultimately came to the conclusion that Hamilton had looted township funds to pay personal expenses. He had wasted no time in doing so: the thefts started just weeks after he took office and continued until immediately before he was caught.

Some of the charges obviously violated criminal laws. These included charges for multiple airline tickets to Las Vegas ($1,519), rental cars, parking fees, out-of-state fuel purchases ($17,502), lawn equipment ($4,269), child support (at least $2,000), car washes ($2,700), and purported bills from Hamilton's construction company ($1,500). Other charges were harder to classify as illicit or legitimate. For example, Hamilton charged about $33,000 to the township card at Home Depot; on another occasion, he attended a conference in his supervisory role, but he inexplicably rented nine hotel rooms and two cars for his use there. Rather than trying to figure out the fraudulent component of these (and various other) charges, the government elected not to count them in the loss calculation, and thus bypassed the chance to show several hundred thousand dollars of additional loss. Once Hamilton "jumped on board" and agreed to plead guilty, the government opted to agree with him that the loss was $40,001, see U.S.S.G. § 2B1.1(b).

This was reflected in the written plea agreement, in which Hamilton and the government stipulated to a total offense level of 13 and criminal history category I, for an advisory imprisonment range of 6 to 18 months. The probation office accepted these calculations. With this range in mind, the government agreed to recommend a sentence of a year and a day, followed by three years' supervised release.

The district court also received a copy of the presentence report and the parties' recommendations, but it was skeptical about the bottom line. Two weeks before sentencing, it issued a 28-page memorandum setting out its reservations. The memo began with a review of the nature, circumstances, and seriousness of the offense. It then discussed the purpose of the township, Hamilton's role as supervisor, and the details of his fraudulent transactions. The judge suggested that Hamilton's actions were especially egregious because the township was in dire financial straits: it had incurred deficits of $2.5 million in fiscal year 2013, and more than $2.7 million the next year, when it was forced to borrow $200,000 to cover operating expenses. By 2015 the operating deficit was nearly $3 million. Hamilton, the judge said, had "treated the financially unstable township as his piggy bank, and felt entitled to do so." All the while, Hamilton was earning a comfortable $140,000 per year from his position as supervisor and various other sources. The median income in East St. Louis is $19,520.

The memo noted that Hamilton's supporters had submitted numerous letters, but the judge was not swayed by them. Hamilton had urged that his misuse of funds not overshadow his other good deeds, but the judge saw things otherwise. Hamilton "chose corruption and greed while hoodwinking the community into believing that he was helping them." This wrongdoing, the judge thought, was more serious than the advisory guideline range indicated, particularly because Hamilton "stole repeatedly and on a regular basis over a five-year period." The judge was also concerned that the harm to the residents who relied on the township's programs was not adequately reflected in the guidelines, other than for the adjustment for abuse of a position of trust. The memo ended with a grim review of notable corruption cases from the East St. Louis area, along with statistics on crime, population, income, and education. Before closing, the court stressed that it was not attributing "all the evils outlined in this memorandum solely to Hamilton." All it was doing was attempting to gain some perspective on the sentencing task. It also said that it "has determined that a within guidelines sentence may be inadequate, [but] it has not determined what sentence is appropriate since it awaits arguments by counsel and the defendant's allocution." It concluded by giving the parties permission to respond to the memorandum, if they chose to do so.

At the sentencing hearing, the judge called Tommy Dancy, Hamilton's successor as Township Supervisor, to testify about the effects of Hamilton's fraud. Dancy said that the thefts were detrimental to the township's mission, that social programs for the poor had been cut as a result of its financial woes, and that its problems were getting worse. Meanwhile, the township is paying $1,000 a month in interest on the loan that

had to be secured to cover operating expenses while Hamilton was stealing from the township's coffers.

In light of the judge's memorandum and Dancy's testimony, the parties submitted an amended plea agreement; the new agreement proposed an above-range, 24-month sentence in lieu of the year and a day in the earlier agreement. The amended agreement assumed that Hamilton would receive full credit for acceptance of responsibility, but that was derailed when the judge asked the prosecutor whether the government had "taken into consideration what is purportedly a text message from Mr. Hamilton" to his supporters. The prosecutor replied that he had seen it, but that defense counsel had assured him that Hamilton had not sent the text, which read as follows:

> I am in need of your support. I am sure the Judge is going to use all the lies the newspaper has printed to give me a maximum sentence. In Moro Township the supervisor misappropriated $700,000 in taxpayer dollars and Judge sentenced him to five years probation. I guess I have to pay for going against the Belleville political party. I need as many citizens of the area to show the Judge the city supports me.

To defense counsel's surprise, at that juncture Hamilton admitted that he had sent the text message to his supporters (but not to the newspaper). The prosecutor announced that this was a breach of the plea agreement, and that the government could now recommend any sentence it wanted. After he lost credit for acceptance of responsibility, Hamilton faced a two-level increase in his offense level and his advisory sentencing range became 18 to 24 months; the government recommended a 30-month sentence, while Hamilton by now was advocating for a 24-month sentence.

The court decided to sentence Hamilton to twice the length the government had suggested. It justified a 60-month sentence primarily on the basis of the discussion in its sentencing memorandum, but it addressed a number of additional points. It explained that it recognized some mitigating factors, such as the fact that Hamilton was married with two minor children, that he had served in the military for two years, and that he had been a businessman in the area for 30 years. But these were outweighed in the court's view by the magnitude of the fraud. The court forthrightly said that it was imposing a sentence not only to deter Hamilton himself from taking similar actions in the future (*i.e.*, specific deterrence), but also to deter others in the community because East St. Louis has been plagued by corruption (*i.e.*, general deterrence). The court was especially struck by the fact that Hamilton had targeted "the poor, the disenfranchised, those who can't fend for themselves." The court rejected Hamilton's argument that his

sentence was unjustifiably higher than the sentence received by the supervisor (in another township) who embezzled $700,000, because the circumstances were different, as that man was suffering from terminal cancer and died two years after his sentencing.

**II**

Hamilton's only argument on appeal is that, as a matter of substance, his prison term is unreasonably long. He does not contend that the sentence is procedurally flawed. He objects to the judge's reliance on general deterrence; he argues that the judge's view of the severity of his crime conflicts with the facts; and he continues to assert that 60 months is too much in light of sentences received by similarly situated defendants. These arguments, however, are more properly addressed to the district court. Once it has calculated the proper advisory guidelines range, as this judge did, the court has broad discretion to choose a proper sentence within any applicable statutory limits, taking into account the factors identified by 18 U.S.C. § 3553(a). See *United States v. Bloom*, 846 F.3d 243, 257 (7th Cir. 2017). We will uphold any sentence that is reasonable.

The district court here gave a detailed account of its thinking, and we see nothing in it that undermines its choice of a sentence. Hamilton particularly criticizes the court's reliance on general deterrence, however, and so we will say a few words about that. He is correct that general deterrence cannot be the only factor supporting a sentence. See *Molton*, 743 F.3d at 486. But that is far from the case here, as even a cursory look at the judge's lengthy memorandum and the sentencing transcript shows. The judge described in detail Hamilton's fraudulent transactions, the township's financial problems, the history of corruption in East St. Louis, and the effect of the fraud on the community. All of these subjects are relevant to the nature and circumstances of the offense. The judge looked at why Hamilton was stealing—for his personal benefit, not because of addiction or need—which addresses the defendant's history and characteristics. The judge was particularly troubled by Hamilton's text message seeking support from citizens; he saw this as more dissembling, pretending to be their friend while he stole from public aid programs. He found these actions to be serious violations of the law, which is another point recognized as a valid sentencing consideration.

In the end, Hamilton's primary objection is to the weight that the court gave to general deterrence. But the weight to give any particular consideration is for the most part up to the district judge. *United States v. Melendez*, 819 F.3d 1006, 1013 (7th Cir. 2016); *United States v. Smith*, 721 F.3d 904, 908 (7th Cir. 2013). Indeed, in another case challenging the same district judge's reliance on the pervasive corruption in the

East St. Louis area and the need for general deterrence, we upheld the sentence because the judge had also weighed other factors. *Molton*, 743 F.3d at 486. The judge made a good case for the need for more general deterrence: while Hamilton was engaging in his fraud, at least two other defendants were sentenced for public corruption, and yet Hamilton evidently paid no attention. And those two were the tip of the iceberg; the sentencing memorandum identifies over 45 similar prosecutions in the district.

We have considered Hamilton's other arguments, but we see nothing else that requires comment. The sentence the district court chose was substantially above the guidelines range, but the judge justified it appropriately, and any disparity with other sentences was not an unwarranted one. We therefore AFFIRM the judgment of the district court.