In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1778

LADMARALD CATES,

*Petitioner-Appellant.*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 14-CV-1092 — **J. P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 7, 2017 — DECIDED FEBRUARY 20, 2018

Before WOOD, *Chief Judge*, and BAUER and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. On a summer day in 2010, Iema Lemons called 911 to report that her neighbors were vandalizing her home on Milwaukee's north side. Officer Ladmarald Cates and his partner responded, but the investigation went seriously off track. By an odd series of events, Cates and Lemons were left alone in her home, and the officer sexually assaulted her.

Cates was charged with two federal crimes: (1) depriving Lemons of her civil rights under color of law, 18 U.S.C. § 242; and (2) using or carrying a firearm in relation to that crime, *id.* § 924(c)(1)(A). The civil-rights charge was premised on the sexual assault by a law-enforcement officer, but the government also alleged that Cates's conduct amounted to aggravated sexual abuse, *id.* § 2241(a), which if proven would dramatically increase the maximum penalty from one year to life in prison, § 242. A jury convicted Cates on the civil-rights count, acquitted him on the firearm count, and found by special verdict that he committed aggravated sexual abuse.

Soon after trial Cates lost confidence in his lawyer, so the judge allowed her to withdraw and appointed a new attorney. A few days before sentencing, the new lawyer moved to extend the deadline for postverdict motions, which had expired several months earlier. The judge denied the motion, holding that the lawyer waited too long to file it and had not shown excusable neglect. Cates was sentenced to 24 years in prison.

The new lawyer continued to represent Cates on direct appeal but inexplicably challenged *only* the denial of his untimely request for more time to file postverdict motions. We rejected that doomed argument and expressed concern that counsel had raised *no* challenge to Cates's conviction or sentence. *United States v. Cates*, 716 F.3d 445, 450–51 (7th Cir. 2013).

The case now returns on Cates's petition for collateral relief under 28 U.S.C. § 2255. He argues, among other things, that his trial and appellate counsel were constitutionally ineffective for failing to challenge the jury instruction on

aggravated sexual abuse. The judge rejected that claim, finding no error in the instruction.

We reverse. As relevant here, aggravated sexual abuse is knowingly causing another person to engage in a sex act by "using force against that other person." § 2241(a)(1). At the government's request, the judge instructed the jury that "force" includes not just physical force but also psychological coercion and may even be inferred from a disparity in size between the defendant and victim. That contradicts both the statutory text and our precedent. "Force" under § 2241(a)(1) means *physical* force, not psychological coercion or threats. *United States v. Boyles*, 57 F.3d 535, 544 (7th Cir. 1995). The jury instruction relaxed the government's burden and permitted the jurors to find force even if they concluded that Cates only used psychological coercion or an implied threat based on his size or status as a police officer. Cates's trial and appellate counsel made key legal errors in not challenging the flawed instruction.

And the errors were prejudicial. There is a reasonable probability that a properly instructed jury would find the evidence insufficient to prove aggravated sexual abuse. That, in turn, would cap Cates's maximum penalty at one year.

## I. Background

Lemons and Cates have given radically different accounts of the events of July 2010. Neither has been entirely consistent, and the physical evidence and testimony from other witnesses likewise conflicts. So the jury had to sort through many credibility questions. What follows is a brief summary of the key evidence and procedural history of the

case. This is not a comprehensive account; it's just enough background to understand this appeal.

At about 1 p.m. on July 16, 2010, Lemons called 911 to report that a neighborhood dispute had turned violent. She had an argument with her neighbors earlier in the day, and the neighbors retaliated by throwing bricks and bottles through her windows. Officer Cates and his partner, Officer Alvin Hannah, arrived at her home, a duplex on Milwaukee's north side where she lived with her 15-year-old brother LaQuan Lemons, her boyfriend Jermaine Ford, and her two children.

When the officers arrived, they secured the home and discovered that LaQuan was wanted on an outstanding juvenile arrest warrant. Lemons, who was her brother's guardian, insisted that the warrant was mistaken. She called LaQuan's social worker to sort things out, but he didn't answer. She left a message asking him to call her back.

In the meantime the officers took LaQuan into custody and placed him in the back of their squad. Officer Hannah stayed there with him while Cates returned to the house. Lemons sent her children away with Ford's sister, ostensibly because of the broken glass in the house. (There's conflicting evidence about who suggested this measure.) She then sent Ford to the store to buy cigarettes. Lemons and Cates were now alone in the house.

Lemons testified that Cates demanded oral sex. (Their stories conflict about whether the sexual encounter began right away or after Ford returned with the cigarettes and was sent back to the store to buy bottled water, and also on the key question whether the encounter was consensual.)

Lemons testified that she didn't consent to perform oral sex but she also didn't resist because she was afraid. Cates was bigger and stronger than she, and if she tried to fight him, she would lose. Cates also had his service firearm and could kill her if she tried to resist. Finally, she testified that Cates's position of authority as a police officer made her feel as though she had no choice but to comply. She explained: "You have to listen to what the police say," and it's not a "smart idea" to fight them. She did as he demanded.

When Ford returned from his errand, Cates gave him $10 and told him to go back to the store to buy water for him and Officer Hannah. Ford again left the house, and Lemons was once again alone with Cates. After several more minutes of oral sex in the bathroom, Cates demanded intercourse. Lemons was too afraid to resist. She testified that Cates grabbed her by the neck, pushed her head toward the sink, and raped her. When he was finished, Lemons vomited on the floor of the dining room. (According to Ford's account, however, Lemons threw up on the dining-room floor *before* she made the 911 call.)

As Cates and Lemons emerged from the house, LaQuan's social worker called back. Lemons answered and handed the phone to Hannah, who was still in the squad with LaQuan. At some point Officer Hannah released LaQuan from the squad, and Cates walked down the street to use the bathroom at a nearby restaurant, behavior that Hannah found to be odd. Two of Lemons's friends—Kandice Velez and Kristi Brooks—were in the neighborhood and approached the house. The evidence is inconsistent about whether Lemons told one or both of them that she had been raped, either at this point or later. The troublesome neighbors then emerged

from across the street, and Lemons began to scream at them. (She denied this.) To calm things down, Officer Hannah escorted Lemons and LaQuan back into the house, where Lemons began yelling at him about why he wasn't arresting the neighbors. The situation became increasingly volatile, and Lemons and LaQuan hurled expletives at the officer. In the midst of this escalating argument, LaQuan suddenly fled the house. Hannah gave chase and attempted to rearrest him. Chaos ensued outside.

LaQuan resisted arrest, and Officer Hannah struggled to physically subdue him. The officer's use of force against her brother enraged Lemons, and she kicked Hannah twice in the back. (She denied this too.) Cates then returned to the scene. LaQuan, still resisting, picked up a brick, which prompted Hannah to summon backup. A swarm of officers responded and finally gained control over the situation. They arrested LaQuan, Lemons, Velez, and Brooks. Lemons remained agitated, so an officer had to drag her to the paddy wagon. As she was being taken into custody, she protested in a loud voice that she had been raped. The officers did not take her seriously.

At the police station, Lemons continued to say that she had been raped and vomited several times. She was transported to the hospital, where she repeated her rape charge to a nurse. The nurse examined her and noted that she had bloodshot eyes, pain and swelling in her neck, and had vomited, all potential indications of having been choked. But she had no signs of vaginal trauma or injury.

The FBI and Milwaukee police opened an investigation into Lemons's allegations. Cates initially denied that he had any sexual contact with her, but his story changed several

times and he eventually admitted both the oral sex and intercourse. He maintained that the entire sexual encounter was consensual. Stains on Cates's uniform and boxer shorts were tested and found to contain Lemons's DNA.

In September 2011 a grand jury issued an indictment charging Cates with two federal crimes. Count One alleged that he deprived Lemons of her civil rights under color of law in violation of § 242 by sexually assaulting her. Count Two alleged that he used or carried a firearm in furtherance of that crime, contrary to § 924(c)(1)(A).

The civil-rights crime carries a prison term of up to one year, but the maximum penalty increases to ten years if the violation results in bodily injury. § 242. If the offense involves aggravated sexual abuse, the maximum penalty is life in prison. *Id.* The government alleged both aggravators, and the prosecutor submitted jury instructions and special-verdict questions on both bodily injury and aggravated sexual assault. Without objection from Cates's attorney, the judge accepted the government's proposed instructions and verdict form.

The jury returned a split verdict, finding Cates guilty on the civil-rights count and not guilty on the firearm count. The jury also found by special verdict that Cates did not cause bodily injury but did commit aggravated sexual assault. As we've noted, the latter finding raised the maximum penalty from one year to life in prison.

When the sentencing date arrived, Cates announced that he was dissatisfied with his retained counsel. Indeed, two months earlier we removed the attorney from our bar for neglecting a client in an unrelated case. *See In re Boyle-Saxton*,

668 F.3d 471 (7th Cir. 2012). The Wisconsin Supreme Court later revoked the attorney's law license for "widespread" professional misconduct. *Office of Lawyer Regulation v. Boyle*, 850 N.W.2d 201, 206 (Wis. 2014). The judge allowed the attorney to withdraw, adjourned the sentencing hearing, and ordered new counsel appointed.

Just days before the rescheduled sentencing hearing, Cates's new attorney moved to enlarge the time to file post-verdict motions under Rules 29 and 33 of the Federal Rules of Criminal Procedure. The deadline had expired five months earlier, and new counsel had been on the case for two months before he asked the judge to reopen the time. The judge denied the motion, finding that the attorney had delayed too long and had not shown excusable neglect. *Cates*, 716 F.3d at 448–49. When things finally got back on track, the judge rescheduled the sentencing hearing and imposed a sentence of 24 years in prison.

Cates's new counsel stayed with the case through direct appeal but challenged *only* the judge's denial of his untimely request for more time to file posttrial motions. That argument was clearly a loser; we affirmed, finding no abuse of discretion. *Id.* at 449–50. We also expressed our concern that Cates's attorney had not challenged "any aspect of [the] conviction or sentence on appeal." *Id.* at 450.

After his ill-fated direct appeal, Cates filed a pro se petition to vacate his conviction and sentence under § 2255. He raised 19 claims, including several based on ineffective assistance of counsel. One such claim was premised on his trial attorney's failure to challenge the jury instruction defining aggravated sexual abuse (and by extension, his appellate attorney's failure to raise the instructional error on

appeal). The judge denied relief across the board. As relevant here, he concluded that the challenged jury instruction was correct. The judge then certified the jury-instruction claim for appeal.[1]

## II. Discussion

Cates asks us to vacate his conviction and sentence based on a violation of his Sixth Amendment right to the effective assistance of counsel for his defense. U.S. CONST. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, Cates must show that his lawyer's performance was deficient and that he suffered prejudice as a result. *Strickland*, 466 U.S. at 687; *Faucett v. United States*, 872 F.3d 506, 509 (7th Cir. 2017). Judicial review of counsel's performance is deferential. Because "[t]here are countless ways to provide effective assistance in any given case," we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Cates has the burden to show that his lawyer's performance fell below an objective standard of reasonableness.[2] *Id.* at 688; *Faucett*, 872 F.3d at 509.

_____

[1] The judge actually certified eight claims for appeal. We appointed the Federal Defender's Office and eventually narrowed the scope of the appeal to the jury-instruction claim and two others. Because we're granting relief on the jury-instruction claim, we have no need to elaborate on the others.

[2] The government argues in passing that Cates waived this claim by not clearly alleging ineffective assistance of trial and appellate counsel in the section of his pro se § 2255 petition pertaining to the mishandling of the jury instruction. The district judge understood Cates to be making an ineffective-assistance claim relating to the jury instruction, denied it, and

Cates's *Strickland* claim rests on an alleged instructional error. If the jury instruction on aggravated sexual assault misstated the law and the error was not harmless, then the first part of the *Strickland* standard has been met. There is no conceivable strategic reason for a defense lawyer to forgo a challenge to a prejudicial jury instruction; a mistake of law is deficient performance. *See Vinyard v. United States*, 804 F.3d 1218, 1225 (7th Cir. 2015) (citing *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014)). And because the instruction at issue here concerned a key sentencing factor that would significantly elevate the maximum prison term, *Strickland* prejudice is established if there is a reasonable probability that a properly instructed jury would have reached a different result. These are pure questions of law, so our review is de novo. *See United States v. Bloom*, 846 F.3d 243, 255 (7th Cir. 2017).

We begin with the statutory definition of aggravated sexual abuse. A person commits the crime of aggravated sexual abuse if he "knowingly causes another person to engage in a sexual act—(1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping." § 2241(a). This text notably contrasts with the statute defining the crime of sexual abuse in its *nonaggravated* form: A person commits sexual abuse if he "knowingly causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping)." 18 U.S.C. § 2242(1).

---

issued a certificate of appealability. We modified the certificate but continued to authorize an appeal of this claim. There was no waiver.

Note the carve-out language in the latter statute, which reinforces the difference between the basic sexual-abuse crime and the aggravated form. The crime of sexual abuse under § 2242(1) encompasses the use of any kind of threat or other fear-inducing coercion to overcome the victim's will. But for *aggravated* sexual abuse under § 2241(a), the jury must find that the defendant (1) actually *used force* against the victim *or* (2) that he made a *specific kind* of threat—i.e., that he threatened or placed the victim in fear of death, serious bodily injury, or kidnapping.

We long ago held that the term "force" in § 2241(a)(1) means *physical* force. *Boyles*, 57 F.3d at 544. *Boyles* describes "force" as "the exertion of *physical* power upon another to overcome that individual's will to resist." *Id.* (emphasis added). Threats and fear, on the other hand, "are not classified as physical power, but rather overcoming one's will to resist through mental and emotional power." *Id.* In other words, psychological coercion is not enough for a finding of "force" under § 2241(a). Rather, the jury must find that the defendant used actual *physical* force.

Alternatively, a jury may find a defendant guilty of aggravated sexual abuse based on proof of a particularly grievous kind of threat or fear—a threat or fear of death, serious bodily injury, or kidnapping. § 2241(a)(2); *see also United States v. Henzel*, 668 F.3d 972, 977 (7th Cir. 2012) (explaining the distinction between "force" and "fear" in this context). Threats or fear-inducing coercion of a lesser nature can support a conviction for the crime of sexual abuse under § 2242(1) but not aggravated sexual abuse under § 2241(a)(2).

Here the jury instruction on aggravated sexual abuse told the jurors that "[t]o establish force, the government need not

demonstrate that the defendant used actual violence." The instruction continued: "The requirement of force may be satisfied by a showing of … the use of threat of harm sufficient to coerce or compel submission by the victim." Finally, the instruction stated that "[f]orce may also be implied from a disparity in coercive power or in size between the defendant and [Lemons]."

By defining "force" in this expansive way, the jury instruction flatly contradicted the text of § 2241(a)(1) and our decision in *Boyles*. The instruction plainly misstated the law by wrongly suggesting that force does *not* mean *physical* force. The jury was told that threats and other nonphysical forms of coercion—including a mere disparity in coercive power or size—could suffice to establish force. That erroneously conflated the distinction between "force" and "fear," relaxing the government's burden. The instruction permitted the jurors to find that Cates committed aggravated sexual abuse based on proof of something less than either physical force or a threat or fear of death or serious bodily injury.

It was a serious mistake for trial counsel not to object to this badly flawed jury instruction. Appellate counsel, moreover, should have raised the instructional error on appeal. The argument he *did* raise was certain to fail. And although trial counsel had forfeited the error and thus review would have been limited to plain error, the flaw in the instruction was both obvious and clear under current law. *See United States v. Natale*, 719 F.3d 719, 731 (7th Cir. 2013) ("Plain error requires obvious error that is clear under current law.") (internal quotation marks omitted). Finally, the last step in plain-error analysis is satisfied here. The instructional error affected Cates's substantial rights, *see id.*, for the same rea-

sons that the error was prejudicial under the *Strickland* standard. We turn to that inquiry now.

*Strickland* prejudice is established if there is a reasonable probability that a properly instructed jury would have found the evidence insufficient to prove that Cates committed aggravated sexual abuse. That standard is met here. True, Lemons testified that Cates squeezed her neck and pushed her head toward a sink; that testimony, if credited by a properly instructed jury, could support a finding of physical force within the meaning of § 2241(a)(1). Lemons also testified that Cates carried his service firearm and she was afraid that he would use it against her if she resisted. That testimony could support a finding of fear of death or serious bodily injury under § 2241(a)(2), which is an alternative basis for a finding of aggravated sexual abuse.

Two circumstances give us substantial reason to doubt that the special verdict rested on either of these findings. First, the jury specifically found that Cates did not cause bodily injury, which makes it unlikely that the jurors believed that he used physical force against Lemons. Second, the jury acquitted Cates on the firearm charge, which makes it unlikely that the jurors believed that he placed Lemons in fear of being shot.

Lemons also testified that she did not resist Cates's demands because he was bigger and stronger and was a police officer. That's clearly insufficient to support a finding of force under § 2241(a)(1). It's possible that a properly instructed jury could find this testimony sufficient to support a "threat" or "fear" theory of the crime (though we are skeptical that there would be many cases in which a mere disparity in size sufficed to support a conviction). But the

alternative statutory basis for *aggravated* sexual abuse requires proof of a threat or fear of *death or serious bodily injury*. There's a reasonable probability that a properly instructed jury would find the evidence insufficient on this point.

In closing, it's worth repeating that the errors by trial and appellate counsel meant the difference between a sentence capped at one year and a maximum penalty of life in prison. We have little difficulty concluding that the errors by Cates's counsel prejudiced his case. Relief under § 2255 is warranted. We reverse and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.